**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
**MANHATTAN DIVISION**

**WILLTON NC NY, LLC**
350 Fifth Avenue, Suite 4820
New York, NY 10118

Plaintiff,

vs.

**MH I INVESTMENT LLC**
Registered Agent: Frank T. Sinito
4000 Key Tower, 127 Public Square
Cleveland, OH 44114

and

**FRANK T. SINITO**
6736 Eagle Mills Rd.
Willoughby, OH 44094

and

**MALISSE SINITO**
6736 Eagle Mills Rd.
Willoughby, OH 44094

and

**ANGELICA BELLE SINITO**
6820 Eagle Mills Rd.
Willoughby, OH 44094

and

**JAMES K. WELLS**
4000 Key Tower, 127 Public Square
Cleveland, OH 44114

and

**JCH WARRENSVILLE, LLC**
Registered Agent: Frank T. Sinito
4000 Key Tower, 127 Public Square
Cleveland, OH 44114

CASE NO. 1:24-cv-05526-AT-JW

Judge Analisa Torres
Magistrate Judge Jennifer Willis

**SECOND AMENDED COMPLAINT**

**JURY TRIAL WAIVED BY CONTRACT, TO BE TRIED BY THE COURT**

and

**LIBERTY PLAZA II INVESTMENT, LLC**
Registered Agent: Frank T. Sinito
4000 Key Tower, 127 Public Square
Cleveland, OH 44114

and

**JCH YOUNGSTOWN, LLC**
Registered Agent: Frank T. Sinito
4000 Key Tower, 127 Public Square
Cleveland, OH 44114

and

**HARBOR VIEW I, LLC**
Registered Agent: Frank T. Sinito
4000 Key Tower, 127 Public Square
Cleveland, OH 44114

and

**ELMCREST INVESTMENT, LLC**
Registered Agent: Frank T. Sinito
4000 Key Tower, 127 Public Square
Cleveland, OH 44114

and

**PETOSKEY RIVERVIEW INVESTMENT, LLC**
Registered Agent: Frank T. Sinito
4000 Key Tower, 127 Public Square
Cleveland, OH 44114

and

**SNOWBERRY INVESTMENT, LLC**
Registered Agent: Frank T. Sinito
4000 Key Tower, 127 Public Square
Cleveland, OH 44114

and

**WINCHESTER I, LLC** )
Registered Agent: Frank T. Sinito )
4000 Key Tower, 127 Public Square )
Cleveland, OH 44114 )
)
and )
)
**POWELL INVESTMENT, LLC** )
Registered Agent: Frank T. Sinito )
4000 Key Tower, 127 Public Square )
Cleveland, OH 44114 )
)
and )
)
**MILLENNIA HOUSING** )
**MANAGEMENT, LTD.** )
Registered Agent: Frank T. Sinito )
4000 Key Tower, 127 Public Square )
Cleveland, OH 44114 )
)
Defendants. )
)

For its Second Amended Complaint (filed pursuant to the Court's Order dated July 23, 2025 [Doc. 68]), Plaintiff Willton NC NY, LLC ("Willton") hereby states the following against MH I Investment LLC ("MH I"); Frank T. Sinito ("Mr. Sinito"), Malisse Sinito ("Mrs. Sinito"), Angelica Belle Sinito ("Ms. Sinito"), and James Wells ("Mr. Wells");[1] JCH Warrensville, LLC, Liberty Plaza II Investment, LLC, JCH Youngstown, LLC, Harbor View I, LLC, Elmcrest Investment, LLC, Petoskey Riverview Investment, LLC, Snowberry Investment, LLC, Winchester I, LLC, and Powell Investment, LLC (collectively, the "GP Affiliates"); and Millennia Housing Management, Ltd. ("MHM") (MH I, Individual Defendants, the GP Affiliates, and MHM are referred to collectively as "Defendants"):

[1] Mr. Sinito, Mrs. Sinito, and Ms. Sinito are referred to collectively as the "Sinitos," and the Sinitos together with Mr. Wells are referred to as the "Individual Defendants."

## OVERVIEW OF THE DISPUTE

1. This lawsuit arises from Defendants' numerous and persistent breaches of contract and related misconduct, all of which were part of a pervasive scam by which Defendants intended to, and did, defraud Willton.

2. Defendants' conduct was part of a pattern and practice of racketeering activity aimed at defrauding and embezzling from Willton and other victims.

3. The Sinitos represented to Willton that MH I was formed to own and/or manage low-income housing properties throughout the country.

4. The Sinitos represented to Willton that MH I is an entity controlled by one or more of the Sinitos.

5. MH I is one of numerous entities controlled by the Sinitos operating collectively under the moniker "The Millennia Companies," which constitute an enterprise, referred to in this Second Amended Complaint as the "Sinito Enterprise."

6. MHM is another one of those entities comprising the Sinito Enterprise; it too is controlled by one or more of the Sinitos.

7. The Sinito Enterprise operates in and effects interstate commerce and, upon information and belief, includes at least the following entities and individuals: MH I, MHM, the GP Affiliates, Millennia Housing Development, Ltd., Millennia Housing Capital LLC, and Individual Defendants. On information and belief, additional entities and individuals comprising the Sinito Enterprise will be uncovered in discovery.

8. On information and belief, The Millennia Companies, including MH I, the GP Affiliates, and MHM, were formed and conduct business as part of the Sinito Enterprise, which is involved in racketeering activity.

9. Based on their claimed vast and successful experience in the industry, the Sinitos pitched to Willton an investment opportunity in MH I related to low-income housing apartment complexes in Ohio, Michigan, and West Virginia (the "Properties"), starting in October 2022. That investment opportunity was part of Defendants' plan to receive federal Low Income Housing Tax Credits for various properties MH I, the GP Affiliates, and MHM owned and/or operated.

10. In January 2023, based on MH I's and the Sinitos' representations, Willton invested over $19 million in FM15 Investments, LLC ("FM15"), an entity the Sinitos' had formed and controlled to own and/or operate the Properties through various property-owning entities (the "Property Owners"), which also were controlled by Mr. Sinito.

11. Pursuant to the Amended and Restated Operating Agreement of FM15 Investments, LLC ("Amended Operating Agreement"), Willton's investment resulted in Willton becoming the majority owner and so-called "Investor Member" of FM15, and MH I becoming the minority owner and "Operating Member" of FM15.[2]

12. In return for Willton's investment, MH I promised to pay a contractual minimum of at least an eight percent (8%) yearly return on Willton's investment (the "Contractual ROI Payments"), as well as a minimum of at least a fifteen percent (15%) Internal Rate of Return ("IRR") (as that term is defined in the Amended Operating Agreement) on Willton's investment at the end of investment period. MH I also provided Willton a contractual Put Right that gave Willton the option to sell its interest in two specific Properties (the properties referred to Cedar Warrensville and Heritage) to MH I immediately upon any Removal Event with respect to those two Properties (Cedar Warrensville and Heritage) for $6,327,528.14.

---

[2] A true and correct copy of the Amended Operating Agreement is attached as **Exhibit 1** and incorporated by reference in this Second Amended Complaint.

13. Mr. Sinito and Mrs. Sinito also executed a joint and several personal guaranty (the "Guaranty") in favor of Willton in which they personally guaranteed certain of MH I's financial obligations to Willton. The Guaranty is attached as Exhibit I to the Amended Operating Agreement.

14. Despite the clear contractual obligations protecting Willton's investment, however, Defendants have repeatedly breached their duties to Willton, and have defrauded and embezzled from Willton from the beginning.

15. By way of example, Willton learned in March 2024 that Mr. Sinito had been investigated by the United States Department of Housing and Urban Development ("HUD"), ultimately resulting in Mr. Sinito personally and MHM being debarred from participating in any federal housing program or receiving any federal Low Income Housing Tax Credits for a period of five years. Instead of disclosing that information to Willton, however, MH I and the Sinitos made participation in federal housing programs and obtaining federal Low Income Housing Tax Credits a central part of the business plan upon which they pitched the investment to Willton (and then went so far as to make the business plan an exhibit to the Amended Operating Agreement, along with a schedule of milestones and timing for benchmarks). MH I and the Sinitos then further expressly reiterated in the Amended Operating Agreement that there were no investigations or proceedings that would interfere with those plans, despite knowing at a minimum that they were in serious jeopardy of being prohibited from engaging in federal low income housing projects or obtaining federal Low Income Housing Tax Credits.

16. Defendants also have engaged in a pattern and practice of fraudulently inducing their partners such as Willton to invest in companies operating as part of the Sinito Enterprise, and then embezzling and/or fraudulently transferring the investments to the Sinito Enterprise's benefit.

17. In April 2024, Willton further discovered that Defendants had almost immediately from the outset of the parties' relationship been misapplying, misappropriating, and embezzling Property Owners' and/or FM15's funds, in violation of Defendants' contractual obligations to Willton. As of June 2025, Defendants have made over 100 unauthorized disbursements of funds from Property Owners and/or FM15's funds, of at least $1.8 million, to Mr. Sinito directly, to an entity associated with him, to unrelated entities for projects unrelated to FM15, and even to Defendants' law firm of record in this lawsuit.

18. MH I also has failed and refused to pay Willton the Contractual ROI Payment, the two most recent of which were due on April 15, 2024 and April 15, 2025, respectively.

19. After MH I failed to make those payments, Willton made demands pursuant to the Guaranty, but Mr. Sinito and Mrs. Sinito similarly breached the Guaranty and have refused to contribute the necessary capital to MH I so that MH I will contribute the funds to FM15 and then make the Contractual ROI Payments to Willton.

20. On May 6, 2024, Defendants' numerous contractual breaches and fraudulent behavior led Willton to exercise its contractual right under the Amended Operating Agreement to remove MH I as the Operating Member of FM15. As part of that removal, Willton also invoked the Put Right from the Amended Operating Agreement, but MH I has breached its obligation to purchase Willton's interest in these Properties pursuant to the Put Right.

21. To effectuate their plan to misapply, misappropriate, and embezzle funds, Defendants worked in concert to hire MHM to "manage" the Properties, which allowed them virtually unfettered access to the Property Owners' and FM15's funds, which they have misappropriated.

**<u>THE PARTIES</u>**

22. Willton is a Delaware limited liability company.

23. MH I is an Ohio limited liability company.

24. MHM is an Ohio Limited Liability Company. On information and belief, one or more of the Sinitos controls and manages MHM.

25. The GP Affiliates are all general partners in the various Property Owners. On information and belief, the GP Affiliates also are controlled and managed by one or more of the Sinitos.

26. Mr. Sinito and Mrs. Sinito are individuals who are domiciled in and citizens of Ohio.

27. On information and belief, Ms. Sinito is an individual who is domiciled in and a citizen of Ohio.

28. On information and belief, Mr. Wells is an individual who is domiciled in and a citizen of Ohio.

## <u>JURISDICTION AND VENUE</u>

29. This Court has original subject matter jurisdiction pursuant to 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331 because this action arises, in part, under the Federal Racketeer Influenced and Corrupt Organizations Act.

30. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because no plaintiff is from the same state as any defendant, so there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000.00, exclusive of interests and costs.

31. To the extent necessary, this Court also can exercise supplemental jurisdiction over any and all state law claims pursuant to 28 U.S.C. § 1367 because all such claims are so related to

the claims in the action within this Court's original jurisdiction that they form part of the same case or controversy.

32. This Court also has personal jurisdiction over Defendants, and venue is proper in this Court.

33. Specifically, in Section 12.02 of the Amended Operating Agreement, the parties to that Agreement all submitted "to the jurisdiction of the federal courts sitting in the State of New York." In that same clause, the parties all also agreed to waive their rights to a jury trial. The GP Affiliates are governed by the Property Owner Partnership Agreements, which incorporate the Amended Operating Agreement and include FM15 as a signatory.

34. This Court also has personal jurisdiction over Ms. Sinito and Mr. Wells, who, on information and belief, operate their businesses in Ohio and New York as executives of The Millennia Companies and/or related entities, are "Key Individuals" of FM15 (as that term is defined in the Amended Operating Agreement), and were actively involved in committing tortious conduct and causing damages to Willton in New York.

35. In addition and in the alternative, this Court has personal jurisdiction over the GP Affiliates, MHM, Ms. Sinito, and Mr. Wells under 18 U.S.C. § 1965(b). As set forth in Count 17 below, this case involves a RICO claim. As outlined in Paragraphs 32-33, above, this Court has personal jurisdiction over MH I, Mr. Sinito, and Mrs. Sinito (three of the RICO defendants). Therefore, even if this Court does not directly have personal jurisdiction over the GP Affiliates, MHM, Ms. Sinito, and Mr. Wells, it still can exercise personal jurisdiction over them based on the nationwide service of process provision contained in 18 U.S.C. § 1965(b).

36. By way of example, on May 12, 2025, Willton (and another party) filed a lawsuit against MHM in the United States District Court for the Southern District of West Virginia (the

"West Virginia Lawsuit"). In response to a motion for temporary restraining order and preliminary injunction in the West Virginia Lawsuit, MHM stated that the case was really part of a "monetary dispute between the parties that has been pending for almost a year" in this Court. *Willton NC NY, LLC, et al. v. Millennia Housing Management Ltd.*, S.D. W.Va. Case No. 2:25-cv-00315, PageID #536. It also reserved the right to seek dismissal for failure to include an indispensable party, and explained that Powell Investment I, LLC—one of the GP Affiliates here—was the general partner in the entity that owned the property at issue in the West Virginia Lawsuit, and that Powell Investment I, LLC and MHM "are family businesses that roll up to the Sinito family." *Id*. at PageID #538. Further, MHM stated that "[t]o the extent this case continues, [it] reserves the right to move to transfer this action to New York as a preferred venue on the basis of judicial economy, convenience and the interest of justice so that the New York can adjudicate the full scope of the dispute." *Id*. at PageID #541. The allegations against MHM in this Second Amended Complaint mirror the claims asserted against MHM in the West Virginia Lawsuit (but for all properties in which the GP Affiliates are involved), and include the GP Affiliates that MHM previously contended was an indispensable party. Based on those facts and judicial representations, the "ends of justice" permit this Court to exercise personal jurisdiction over all Defendants in this case under 18 U.S.C. § 1965(b).[3]

37. This Court also has jurisdiction against the GP Affiliates, MHM, Ms. Sinito, and Mr. Wells based on an alter ego theory, including as set forth in Count 17 below. Defendants collectively operate as an enterprise. As alleged throughout this Second Amended Complaint, Defendants comingled funds, transferred funds from one entity to another without authorization, paid one company's debts with funds from another, on information and belief failed to maintain

[3] Willton stipulated to the dismissal of the West Virginia Lawsuit on July 16, 2025, in favor of bringing all its claims in this Court.

separate records, on information and belief intermingled personnel, and routinely engaged in transactions that were not at arm's-length. Including for the reasons set forth throughout this Second Amended Complaint, treating Defendants as anything other than alter egos would result in an injustice and fraud by allowing Defendants to abuse the corporate form to avoid being haled into Court.

## FACTUAL BACKGROUND

### A. The Transaction Embodied in the Amended Operating Agreement

38. Starting in October 2022, MH I and the Sinitos began seeking an investment from Willton, premised on a business plan to operate a portfolio of low-income housing projects, which they claimed would permit them to obtain federal Low Income Housing Tax Credits for various properties across the country.

39. As part their inducement of Willton, MH I and the Sinitos represented that they and their related companies had the necessary governmental approval, authority, and ability to consummate all the transactions related to the Properties and to the business plan they had created to operate low-income housing projects and obtain federal Low Income Housing Tax Credits.

40. Based on and in reliance upon MH I's and the Sinitos' representations, the business plan MH I and the Sinitos presented (which MH I and the Sinitos attached as an exhibit to the Amended Operating Agreement, along with a schedule of milestones and timing for benchmarks), and the Sinitos' claimed experience and success in managing low-income housing projects across the country, Willton agreed in January 2023 to invest over $19 million with MH I and the Sinitos, for which Willton received an 84.86% interest in FM15.

41. Mr. Sinito and Mrs. Sinito also transferred their remaining fifteen and 14/100 percent (15.14%) membership interest in FM15 to MH I.

42. To formalize and govern Willton's investment, on January 30, 2023, the parties executed the Amended Operating Agreement.

43. The Amended Operating Agreement admitted MH I as the "Operating Member" of FM15, and Willton as the "Investor Member."

**B. Mr. Sinito's and Mrs. Sinito's Guaranty Obligations to Willton**

44. Concurrently with and as an exhibit to the Amended Operating Agreement, Mr. Sinito and Mrs. Sinito also executed the Guaranty in Willton's favor, thereby protecting Willton's investment by personally guaranteeing certain of MH I's financial obligations under the Amended Operating Agreement to Willton. Accordingly, in the Guaranty, Mr. Sinito and Mrs. Sinito personally guaranteed both the IRR Purchase Price (including the Put Right) as well as the Contractual ROI Payments.

45. Mr. Sinito and Mrs. Sinito both signed the Guaranty jointly and severally in Willton's favor.

46. The Guaranty specifically states that Willton was "unwilling to enter into the Operating Agreement unless [each of the Sinitos] provides the guaranties under this Agreement."

47. Section 6 of the Guaranty also states: "Attorneys' Fees. In the event it becomes necessary for [Willton] to exercise its rights under this Agreement, whether suit be brought or not, [Mr. Sinito and Mrs. Sinito] shall be liable for all reasonable costs and reasonably attorneys' fees incurred by [Willton], including costs and attorneys' fees incurred by [Willton] in any appellate and post judgment collection proceedings."

### C. The Property Owner Partnership Agreements and the Property Management Agreements

48. Concurrently with and as an exhibit to the Amended Operating Agreement, FM15 executed nine separate agreements (the "Partnership Agreements" or "Property Owner Partnership Agreements") establishing partnerships (the "Partnerships") between itself and the GP Affiliates.

49. The role of the GP Affiliate in each Partnership Agreement is to manage and operate the relevant Property Owner and Property to meet the requirements and limitations under the Amended Operating Agreement.

50. In each agreement, a GP Affiliate is the "General Partner" and FM15 is the "Limited Partner" and/or "Class B Special Limited Partner" and/or "Special Limited Partner."

51. The Property Management Agreement is also defined as an "Operating Member Affiliate Agreement" in the Amend Operating Agreement.

52. The management responsibilities of the GP Affiliates to the Partnerships and the Properties mirror those of the Operating Member to FM15 and the Properties.

53. Willton has the same rights and remedies under the Partnership Agreements as it has under the Amended Operating Agreement.[4]

54. Concurrently with and as an exhibit to the Amended Operating Agreement, the GP Affiliates executed nine separate property management agreements (the "Property Management Agreements") between the Property Owners and MHM.

55. MHM's role in each Property Management Agreement is to maintain and operate the relevant Property in accordance with the business plan and budget established in the Amended Operating Agreement.

---

[4] True and correct copies of each of the agreements with the GP Affiliates are attached hereto collectively as **Exhibit 2** and incorporated by reference in this Second Amended Complaint.

56. In each Property Management Agreement, MHM is the "Agent" and the relevant Property Owner is the "Owner."

57. The Property Management Agreement is also defined as an "Operating Member Affiliate Agreement" in the Amend Operating Agreement.

58. Willton has the rights under the Property Management Agreements, the Amended Operating Agreement, and the Partnership Agreements to terminate the Property Management Agreements.[5]

**D. The Removals**

59. Based upon MH I's numerous breaches of the Amended Operating Agreement, on May 6, 2024, Willton transmitted the "Removal Event Notice" pursuant to Section 4.04(a) of the Amended Operating Agreement, identifying numerous "Removal Events," and stating that Willton was removing MH I as the Operating Member of FM15.[6]

60. As a result, pursuant to the terms of the Amended Operating Agreement, MH I is no longer the Operating Member of FM15, although it remains obligated to continue managing the day-to-day affairs of FM15 until a new manager can be named.

61. In a letter dated July 2, 2024, MH I acknowledged receipt of the Removal Event Notice and exercised its "Purchase Right under Section 11.03(a)(ii)" of the Amended Operating Agreement, which gave it 120 days from the date of that letter (i.e., until October 30, 2024) to purchase Willton's Membership Interest in FM15.[7]

---

[5] True and correct copies of each of the Property Management Agreements are attached hereto collectively as **Exhibit 3** and incorporated by reference in this Second Amended Complaint.

[6] A true and correct copy of the Removal Event Notice is attached as **Exhibit 4** and incorporated by reference in this Second Amended Complaint.

[7] A true and correct copy of that letter is attached as **Exhibit 5** and incorporated by reference in this Second Amended Complaint.

62. MH I did not tender payment to Willton for Willton's Membership Interest in FM15 by October 30, 2024.

63. Therefore, on October 31, 2024, Willton sent a letter to MH I and the GP Affiliates, providing those entities with notice of MH I's further breach of the Amended Operating Agreement by failing to tender payment for Willton's Membership Interest in FM15, and also giving explicit notice that it had exercised its rights to remove the GP Affiliates as General Partners of each Partnership.[8]

64. On February 13, 2025, Willton sent letters to MH I, MHM, and the GP Affiliates in which it gave notice that it was invoking certain rights afforded to it under the Amended Operating Agreement, Partnership Agreements, and Property Management Agreements, including:

a. Exercising all of MH I's rights as Operating Member;

b. Appointing a new manager of FM15;

c. Terminating MH I's rights to consent, approval, or management;

d. Terminating the Property Management Agreement between each Partnership and MHM;

e. Causing FM15 to sell its interest in seven Property Owners and dissolve FM15;

f. Exercising all of the GP Affiliates' rights as General Partner;

g. Appointing a new manager and/or a new General Partner for each Partnership;

h. Terminating the GP Affiliates' rights to consent, approval, or management; and

i. Demanding MH I, the GP Affiliates, and MHM deliver to the various Partnerships, FM15, and Willton all project documents, contracts, books, records, and accounts in MH I's, the GP Affiliates' and MHM's possession.[9]

[8] A true and correct copy of that letter is attached as **Exhibit 6** and incorporated by reference in this Second Amended Complaint.

[9] True and correct copies of those letters are attached collectively as **Exhibit 7** and incorporated by reference in this Second Amended Complaint.

**COUNT 1**
**Piercing the Corporate Veil against all Defendants**

65. Willton incorporates by reference as though fully rewritten herein all allegations contained in Paragraphs 1-64 of this Second Amended Complaint.

66. The Sinitos control MH I, MHM, and the GP Affiliates.

67. The Sinitos exert such dominion and control over MH I, MHM, and the GP Affiliates that MH I, MHM, and the GP Affiliates have no separate mind, will, or existence of their own.

68. The Sinitos' dominion and control over MH I, MHM, and the GP Affiliates has been, and continues to be, exercised in a manner to commit harmful, unfair, unjust, inequitable, wrongful, and fraudulent acts against Willton, including as set forth throughout this Second Amended Complaint.

69. MH I, MHM, and the GP Affiliates are and, at all relevant times were, undercapitalized and unable to satisfy the financial obligations that they undertook, including those obligations owed to Willton.

70. MH I's, MHM's, and the GP Affiliates' inability to satisfy their obligations, including to Willton, is a direct result of the Sinitos' control and dominion over them, including but not limited to one or more of the Sinitos directing MH I, MHM, and the GP Affiliates to make financial transfers directly to Mr. Sinito (MH I's managing member) and to other entities that one or more of the Sinitos' control.

71. As a direct and proximate result of the Sinitos' control over MH I, MHM, and the GP Affiliates, Willton has sustained financial harm, as set forth in more detail throughout this Second Amended Complaint.

72. Defendants owe Willton in excess of Seventy-Five Thousand Dollars ($75,000.00), with the exact amount to be proven at trial. Any alleged separate corporate existence of MH I and the GP Affiliates and MHM and the Sinitos should be disregarded in equity and Willton should be permitted to recover all damages and liabilities otherwise attributable to MH I, MHM, and the GP Affiliates directly from the Sinitos.

**COUNT 2**
**Breach of Contract (Amended Operating Agreement) against MH I**

73. Willton incorporates by reference as though fully rewritten herein all allegations contained in Paragraphs 1-72 of this Second Amended Complaint.

74. The Amended Operating Agreement constitutes a valid, binding, and enforceable contract.

75. Starting almost immediately after its execution in January 2023, MH I began breaching the Amended Operating Agreement in numerous ways.

76. For example, in violation of Sections 3.05, 5.01, and 5.02 of the Amended Operating Agreement MH I has failed to provide Willton with full and transparent financial information related to its investment, and has continually refused to provide complete books and records and timely, accurate, and fulsome financial reporting. As examples of these breaches:

a. MH I has never provided any of the following: (1) a quarterly asset report; (2) a current year cash flow reforecast; (3) cash flow statements containing columns for quarterly and year-to-date pro forma and quarterly and year-to-date; (4) a copy of all written reports produced by Operating Member that discuss historical or projected performance of the Properties; or (5) a competitive market survey for the market in which the Properties are competing, reflecting the rents being charged by competing projects, and if available, the occupancy levels of such competing projects;

b. MH I has consistently provided Willton with incorrect, incomplete, and even fraudulent financial records and accompanying oral or written statements; and

c. MH I has not provided Willton with tax returns for FM15 or accurate Form K-1(s), and MH I did not consult with Willton or obtain Willton's approval concerning the filing of tax returns as required.

77. MH I and its affiliates have misappropriated more than $1.8 million by making hundreds of unauthorized disbursements from Property Owners' and FM15's funds without Willton's consent in violation of the "Major Decisions" requirements of Section 4.01(b)(14) of the Amended Operating Agreement. Many of these unauthorized disbursements have been to Mr. Sinito himself or other entities in which he has a financial interest unrelated to FM15, which also is in violation of Section 4.09(a) of the Amended Operating Agreement.

a. To date, Willton has identified at least 13 entities that received unauthorized transfers in violation of the "Major Decisions" requirements. These transactions, often endorsed personally by Mr. Sinito, appear to have occurred regularly and with respect to each FM15 Property and Property Owner. Each such unauthorized transfer to a non-FM15 related entity constitutes a separate breach of Section 4.09(a) of the Amended Operating Agreement, which requires that all business ventures and revenues arising from or relating to the Properties be solely for the benefit of the Company.

b. Similarly, to date, Willton has identified at least 100 unauthorized payments totaling over $1.5 million made to Mr. Sinito personally.

c. Along with these unauthorized payments, Willton has discovered numerous other similarly improper transfers (totaling at least 118 unauthorized transactions identified thus far). Each instance of such unauthorized payments constitutes a separate breach of the "Major Decisions" obligations from Section 4.01(b)(14) of the Amended Operating Agreement.

d. Those unauthorized payments have continued during the pendency of this lawsuit and have included payments made to Defendants' counsel of record in this case.

78. Between January 30, 2023 and May 6, 2024, MH I failed to make distributions in violation of Section 8.02 of the Amended Operating Agreement, under which Willton should have received 100% of all distributions until Willton has received an 8% per annum return. After May 6, 2024, MH I continued to fail to make distributions, further breaching Section 4.04(c) of the Amended Operating Agreement.

79. Similarly, MH I has failed and refused to pay Willton the Contractual ROI Payments when they became due on April 15, 2024 and April 15, 2025, in violation of Section 8.02 of the Operating Agreement.

80. After MH I's failure to pay the Contractual ROI Payments, Willton delivered notices (the "Contractual ROI Payment Notice Letters") to MH I (and the Sinitos) under Section 8.02 of the Amended Operating Agreement.[10]

81. As identified in the Contractual ROI Payment Notice Letters, MH I owed payment to Willton of at least $1.2 million as return on its investments earned from January 30, 2023 to December 31, 2023, and at least $2.1 million as return on its investments earned from January 1, 2024 to December 31, 2024.

82. MH I still has not made the Contractual ROI Payments.

83. MH I also has breached the Amended Operating Agreement by failing to remedy the material casualty damage to the Properties that occurred prior to January 30, 2023 and to pay those costs of repair solely out-of-pocket or using insurance proceeds, in violation of Section 2.11 of the Amended Operating Agreement.

84. Despite Willton's repeated requests, MH I has failed to provide Willton with full and transparent information related to the repairs, costs paid, and physical condition of the Properties, and has misappropriated at least $278,000 FM15 funds to pay for the repairs.

85. MH I also has breached the Amended Operating Agreement by failing to pay for the "Capital Expenditures" solely using the "Existing Reserve Amounts" or "Ongoing Reserve Amounts" or solely out-of-pocket by MH I, and MH I has further failed to pay for water heater replacement at the properties referred to as Liberty Plaza and Rolling Hills first solely using the

---

[10] True and correct copies of the Contractual ROI Payment Notice Letters are attached collectively as **Exhibit 8** and incorporated by reference in this Second Amended Complaint.

"Existing Reserve Amounts," both in violation of Section 4.13(a) of the Amended Operating Agreement.

86. MH I also has beached Section 11.02 of the Amended Operating Agreement by refusing to purchase Willton's interest in two specific Properties (the properties referred to Cedar Warrensville and Heritage) for $6,327,528.14 within sixty (60) days of Willton's May 6, 2024 provision of notice to Defendants that it was exercising its Put Right on those properties.

87. MH I also has breached the Amended Operating Agreement by failing to pay to FM15 the loss resulting from its representations and warranties in excess of $50,000 in Net Cash Flow and balance sheet to FM15 and the Property Owners. (*See* Amended Operating Agreement, § 2.10.)

88. MH I also has breached the Amended Operating Agreement by failing to fulfill the stated purpose and scope of FM15 and its Low Income Housing Tax Credit business plan, thus failing to cause its affiliate to provide directly to Willton a minimum of fifteen percent (15%) IRR on its investment. (*See* Amended Operating Agreement, §§ 2.05, 11.02.)

89. MH I also has breached Section 11.03 of the Amended Operating Agreement after its exercise of the Purchase Right, by failing to pay the Purchase Price of $31,377,964.77 to Willton to purchase Willton's Membership Interests in FM15 by October 30, 2024.

90. MH I also breached the Amended Operating Agreement following the occurrence of the Removal Event by refusing to cause its affiliates to terminate all Operating Member Affiliate Agreements after Willton exercised its termination rights on behalf of FM15. (*See* Amended Operating Agreement, §§ 4.04, 4.07.)

91. Finally, as discussed in more detail below with respect to Defendants' fraudulent behavior, MH I further breached the representations provisions in the Amended Operating

Agreement, including its representations that there were no actual or threatened proceedings that would have a material adverse effect (financial or otherwise) on FM15, FM15 Properties, or Property Owners, or threaten or jeopardize Defendants' ability to achieve the goals and business plan of the Amended Operating Agreement, all in violation of Section 2.08 and 2.09 of the Amended Operating Agreement.

92. Willton has performed and/or fulfilled its obligations and conditions precedent under the Amended Operating Agreement in all material respects, including by having provided Defendants with written notices and cure periods for any and all such breaches that may be required by the Amended Operating Agreement.

93. Willton has suffered damages as a direct and proximate result of MH I's breaches of the Amended Operating Agreement in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), with the exact amount to be proven at trial.

94. In the alternative, Willton seeks the equitable remedy of rescission of the Amended Operating Agreement and the return of its total investment with Defendants of $19,250,285 plus interest.

**COUNT 3**
**Breach of Contract (Guaranty) against Mr. Sinito and Mrs. Sinito**

95. Willton incorporates by reference as though fully rewritten herein all allegations contained in Paragraphs 1-94 of this Second Amended Complaint.

96. The Guaranty constitutes a valid, binding, and enforceable contract.

97. When MH I failed and refused to make the Contractual ROI Payments when they became due on April 15, 2024 and April 15, 2025, respectively, Willton sent follow up letters on May 7, 2024 and April 16, 2025, respectively (the "Guaranty Demand Letters") demanding that Mr. Sinito and Mrs. Sinito make the necessary capital contributions to MH I so that MH I would

then contribute the funds to FM15 and make the Contractual ROI Payments to Willton pursuant to Mr. Sinito's and Mrs. Sinito's obligations under the Guaranty.[11]

98. In breach of their guaranty obligations, Mr. Sinito and Mrs. Sinito have failed and refused to make the necessary capital contributions to MH I so that MH I would then contribute the funds to FM15 and pay Willton the Contractual ROI Payments pursuant to the Guaranty.

99. In further breach of their guaranty obligations, Mr. Sinito and Mrs. Sinito also have failed and refused to provide the most recent balance sheet to evidence not less than $41,110,000 in equity, and to evidence that Mr. Sinito and Mrs. Sinito have not pledged, conveyed, transferred, or collateralized their assets so as to reduce the same on the balance sheet below $41,110,000 without Willton's prior consent.

100. Additionally, MH I failed to abide by its obligation under Section 11.02 of the Amended Operating Agreement pursuant to the Put Right by refusing to purchase Willton's interest in two specific Properties (the properties referred to Cedar Warrensville and Heritage) for $6,327,528.14 within sixty (60) days of Willton's May 6, 2024 provision of notice to Defendants that it was exercising the Put Right.

101. Therefore, on July 5, 2024, Willton sent a notice to Mr. Sinito and Mrs. Sinito of their guaranty obligations relating to the Put Right, and demanding compliance within thirty (30) days of those obligations as set forth in the Guaranty (the "July 5, 2024 Guaranty Demand Letter").[12]

102. Mr. Sinito and Mrs. Sinito received the July 5, 2024 Guaranty Demand Letter on or before July 9, 2024.

[11] True and correct copies of the Guaranty Demand Letters are attached collectively as **Exhibit 9** and incorporated by reference in this Second Amended Complaint.

[12] A true and correct copy of the July 5, 2024 Guaranty Demand Letter is attached as **Exhibit 10** and incorporated by reference in this Second Amended Complaint.

103. In further breach of their guaranty obligations, Mr. Sinito and Mrs. Sinito have failed and refused to pay to Willton the relevant purchase price in the amount of $6,327,528.14, as necessary to satisfy Willton's Put Right in the properties referred to Cedar Warrensville and Heritage.

104. Willton has performed and/or fulfilled its obligations under the Guaranty in all material respects.

105. Willton has suffered damages as a direct and proximate result of Mr. Sinito's and Mrs. Sinito's breaches of the Guaranty in an amount in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), with the exact amount to be proven at trial.

106. In the alternative, Willton is entitled to specific performance in the form of an order mandating that Mr. Sinito and Mrs. Sinito distribute the amount of the Contractual ROI Payment to Willton, satisfy payment on Willton's Put Right, and provide a true and correct most recent balance sheet evidencing not less than $41,110,000 in equity.

107. Further, Willton is entitled to an award of all its attorneys' fees and costs from Mr. Sinito and Mrs. Sinito pursuant to Section 6 of Guaranty.

**COUNT 4**
**Declaratory Judgment (ROI, Put Right, and Reimbursements) against MH I**

108. Willton incorporates by reference as though fully rewritten herein all allegations contained in Paragraphs 1-107 of this Second Amended Complaint.

109. Willton brings this Count pursuant to 28 U.S.C. § 2201(a).

110. An actual controversy has arisen between Willton and MH I as to MH I's obligations under the Amended Operating Agreement.

111. Willton seeks a declaration that:

a. MH I is obligated to pay Willton the 8% per year Contractual ROI Payments as of April 15 of each calendar year, plus interest from the date each such Contractual ROI Payment was due;

b. MH I is obligated pay Willton the amount of the Put Right by purchasing Willton's interest in the properties referred to as Cedar Warrensville and Heritage for $6,327,528.14, plus interest from July 22, 2024; and

c. MH I is obligated to immediately return or repay all funds disbursed in connection with the unauthorized operating expenses and capital expenditures.

112. Such declarations will conclusively establish the rights and legal relations of the parties.

**<u>COUNT 5</u>**

**Declaratory Judgment (ROI, Put Right, Balance Sheet) against Mr. Sinito and Mrs. Sinito**

113. Willton incorporates by reference as though fully rewritten herein all allegations contained in Paragraphs 1-112 of this Second Amended Complaint.

114. Willton brings this Count pursuant to 28 U.S.C. § 2201(a).

115. A controversy has arisen between Willton and Mr. Sinito and Mrs. Sinito as to Mr. Sinito's and Mrs. Sinito's obligations under the Guaranty.

116. Willton seeks a declaration that:

a. Mr. Sinito and Mrs. Sinito are jointly and severally obligated to make the necessary capital contributions to MH I so that MH I must then contribute the funds to FM15 and tender immediately to Willton the 8% per year Contractual ROI Payments as of April 15 of each calendar year, plus interest from the date each such Contractual ROI Payment was due, as guarantors of MH I's obligations under the Amended Operating Agreement;

b. Mr. Sinito and Mrs. Sinito are jointly and severally obligated to pay Willton $6,327,528.14 with respect to the properties referred to as Cedar and Warrensville and Heritage, plus interest, to satisfy Willton's Put Right; and

c. Mr. Sinito and Mrs. Sinito are obligated to provide to Willton a true and correct copy of their most recent balance sheet evidencing not less than $41,110,000 in equity.

117. Such declarations will conclusively establish the rights and legal relations of the parties.

**COUNT 6**
**Declaratory Judgment (IRR, GP Affiliates, Purchase Price, Books and Records, Inspections, Audits, Expenditures, and Sale) against MH I**

118. Willton incorporates by reference as though fully rewritten herein all allegations contained in Paragraphs 1-117 of this Second Amended Complaint.

119. Willton brings this Count pursuant to 28 U.S.C. § 2201(a).

120. An actual controversy has arisen between Willton and MH I as to MH I's obligations under the Amended Operating Agreement.

121. Willton seeks a declaration that:

a. MH I is obligated to cause its affiliate to provide directly to Willton a minimum of a fifteen percent (15%) IRR on Willton's investment;

b. MH I is obligated to compensate FM15 for any losses to FM15 and the Property Owners exceeding $50,000 in Net Cash Flow or balance sheet impact resulting from its breached representations and warranties;

c. MH I is obligated to make and/or cause the GP Affiliates to make all distributions to Members in accordance with the Amended Operating Agreement;

d. MH I is obligated to pay Willton the amount of Purchase Right by purchasing Willton's Membership Interest in FM15 (excluding its interests in the properties referred to Cedar Warrensville and Heritage, which are subject to Willton's Put Right) for $25,050,436.63 (i.e., $31,377,964.77 minus $6,327,528.14), plus interest from October 30, 2024;

e. MH I is obligated to deliver to Willton all accounts, books, and records of FM15 and each Property Owner;

f. MH I is obligated to satisfy Willton's demand to inspect each Property, and books and records on-site and off-site;

g. MH I is obligated to satisfy Willton's and Willton's designated agents' requirements to complete the audit of books of account records;

h. MH I is obligated to immediately provide documents and answer audit inquiries required to complete the 2024 HUD annual audit;

i. MH I is obligated to immediately pay for all Capital Expenditures and Pre-Closing Property Damage and direct and indirect damages to the Property Owners, FM15, and Willton; and

j. Willton has the right, in its sole discretion and without the consent of any person or entity, to sell or otherwise transfer FM15's interest in the Properties or any related entity, and to apply any proceeds toward the satisfaction of any judgment in this case.

122. Such declarations will conclusively establish the rights and legal relations of the parties.

**<u>COUNT 7</u>**
**Declaratory Judgment (IRR) against Mr. Sinito and Mrs. Sinito**

123. Willton incorporates by reference as though fully rewritten herein all allegations contained in Paragraphs 1-122 of this Second Amended Complaint.

124. Willton brings this Count pursuant to 28 U.S.C. § 2201(a).

125. A controversy has arisen between Willton and Mr. Sinito and Mrs. Sinito as to Mr. Sinito's and Mrs. Sinito's obligations under the Guaranty.

126. Willton seeks a declaration that Mr. Sinito and Mrs. Sinito are jointly and severally obligated to pay Willton the IRR Purchase Price to provide Willton with an IRR equal to fifteen percent (15%) on Willton's interest in the Properties (excluding Cedar and Warrensville or Heritage, which are subject to Willton's Put Right).

127. Such declaration will conclusively establish the rights and legal relations of the parties.

**<u>COUNT 8</u>**
**Breach of Contract (Amended Operating Agreement and Partnership Agreements) against the GP Affiliates**

128. Willton incorporates by reference as though fully rewritten herein all allegations contained in Paragraphs 1-127 of this Second Amended Complaint.

129. The Amended Operating Agreement constitutes a valid, binding, and enforceable contract.

130. The Partnership Agreements constitute valid, binding, and enforceable contracts.

131. Under the terms of the Amended Operating Agreement and the Partnership Agreements, any act or event relating to any GP Affiliate, the Partnership, or the Partnership Property which constitutes a Removal Event under the Amended Operating Agreements also constitute a Removal Event under the Partnership Agreement and gave Willton the same rights and remedies under the Partnership Agreement as it has under the Amended Operating Agreement.

132. Willton exercised those removal rights, as set forth above, and the GP Affiliates have refused to comply with their obligations pursuant to those removal rights.

133. To date, after their removals the GP Affiliates have not delivered the records and reports as required.

134. Sections 4.01(b) and 11.01 of the Amended Operating Agreement regarding Major Decisions, as defined in that Agreement, apply to the decisions and actions regarding the Partnership and the General Partner under the Partnership Agreement so that the GP Affiliates were required to obtain Major Decision approval from Willton under the Partnership Agreements in the same manner as MH I was required to obtain Major Decision approval of Willton under the Amended Operating Agreement. The GP Affiliates breached their respective Partnership Agreements by failing to obtain Willton's approvals for Major Decisions, most notably by making unauthorized distributions. That misconduct was substantiated by the 2023 HUD Audit Reports, which were prepared by an independent auditor and certified by both the GP Affiliates and MHM.

135. Willton has performed and/or fulfilled its obligations and conditions precedent under the Amended Operating Agreement and the Partnership Agreements in all material respects.

136. Willton has suffered damages as a direct and proximate result of the GP Affiliates' breaches of contract in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), with the exact amount to be proven at trial.

**COUNT 9**
**Breach of Contract (Property Management Agreements) against MHM**

137. Willton incorporates by reference as though fully rewritten herein all allegations contained in Paragraphs 1-136 of this Second Amended Complaint.

138. The GP Affiliates, MH I, and Willton executed Property Management Agreements for each relevant Property.

139. The Property Management Agreements constitute valid, binding, and enforceable contracts.

140. Under the terms of the Property Management Agreements, the Owner has the right to terminate the agreements if MH I is removed as the Operating Member of FM15 or if the applicable GP Affiliate is removed as the General Partner of the relevant Partnership. In addition, the Amended Operating Agreement and the Partnership Agreements expressly grant Willton the sole authority to terminate the Property Management Agreements on behalf of FM15 and the Property Owners.

141. On February 13, 2025, Willton delivered notices to MH I, each of the GP Affiliates, and MHM that Willton exercised its right under the Amended Operating Agreement, the Partnership Agreements, and the Property Management Agreements to terminate each Property Management Agreement and all agreements, arrangements, and fees with MHM and MH I's affiliates, including termination of all property management fees to MHM, following the Removal Event Notice, as set forth above.

142. The Property Management Agreements required MHM to submit to Willton all records and reports described in Paragraph 15 of each such Agreement as of the date of termination within 30 days following such termination. To date, MHM has not delivered the records and reports as required.

143. The Property Management Agreements also required MHM to deliver to Willton all cash, trust accounts, investments, and books and records in its possession within thirty (30) days after the termination date. Again, MHM has not delivered any of those materials to Willton as required.

144. As a result of the removals, MHM also is no longer permitted to operate or be present on the Properties.

145. Willton notified MH I, the GP Affiliates, and MHM that the termination of each Property Management Agreement shall take effect on April 15, 2025, and MHM has refused to comply with its obligations triggered by the termination of those Agreements and continues to collect property management fees.

146. Willton has performed and/or fulfilled its obligations and conditions precedent under the Property Management Agreements in all material respects.

147. Willton has suffered damages as a direct and proximate result of the MHM's breaches of the Property Management Agreements in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), with the exact amount to be proven at trial.

**COUNT 10**
**Declaratory Judgment against MH I, the GP Affiliates, and MHM**

148. Willton incorporates by reference as though fully rewritten herein all allegations contained in Paragraphs 1-147 of this Second Amended Complaint.

149. Willton brings this Count pursuant to 28 U.S.C. § 2201(a).

150. An actual controversy has arisen between Willton on the one hand, and MH I, the GP Affiliates, and MHM, on the other hand, regarding Willton's right to have MH I removed as Operating Member of FM15, the GP Affiliates removed from their roles as General Partner of the various Partnerships, and MHM terminated from its role as Agent for the various Properties based on the terms of the Amended Operating Agreement, the respective Property Owner Partnership Agreements, and Property Management Agreements.

151. Therefore, Willton seeks a declaration that:

a. Willton has the sole and exclusive authority to cause FM15 and the Property Owners to amend, modify, supplement, or terminate any Operating Member Affiliate Agreements, including the Partnership Agreements and Property Management Agreements;

b. MH I has been and is removed as Operating Member of FM15, and is required to relinquish all management rights, powers, and authority over FM15 to Willton;

c. Each GP Affiliate has been and is removed from its role as manager and General Partner of its Partnership, and is required to relinquish all management rights, powers, and authority over Property Owners to FM15 and Willton;

d. MHM has been and is terminated from its role as property manager for the Properties;

e. MH I, each of the GP Affiliates, and MHM are obligated to immediately surrender to Willton all books, records, and accounts in accordance with the Amended Operating Agreement, the Property Owner Partnership Agreements, and the Property Management Agreements;

f. MH I, each of the GP Affiliates, and MHM are obligated to cooperate with Willton, HUD, state and local authorities, and lenders in effectuating their respective removals and terminations;

g. MH I, the GP Affiliates, and MHM are obligated to provide documents and answer audit inquiries to complete 2024 HUD annual audit;

h. MH I, each of the GP Affiliates, and MHM are obligated to permit a third-party certified public accountant retained by Willton to commence on-site audits; and

i. MH I, the GP Affiliates, and MHM are obligated to return any overpayment of property management fees to Property Owners.

152. Such declarations will conclusively establish the rights and legal relations of the parties.

**<u>COUNT 11</u>**
**Ejectment against MH I, MHM, and the GP Affiliates**

153. Willton incorporates by reference as though fully rewritten herein all allegations contained in Paragraphs 1-152 of this Second Amended Complaint.

154. Willton holds all rights of ownership and control over the Properties.

155. Willton's rights in the Properties exist pursuant to the Amended Operating Agreement and the Partnership Agreements.

156. Willton holds all rights of ownership and control over the Properties following Willton's removal of MH I as "Operating Member" and the removals of the GP Affiliates as "General Partner."

157. The removals of MH I and the GP Affiliates were in accordance with the Amended Operating Agreement's and the Partnership Agreements' terms, respectively.

158. The Property Management Agreements previously allowed MHM to operate and manage the Properties.

159. The Properties are designated as Section 8 housing pursuant to the United States Housing Act. Accordingly, HUD has regulatory oversight authority over the Properties.

160. Following years of mismanagement and misconduct, MHM received notice from HUD on December 14, 2023 that HUD was considering a five-year debarment against MHM.

161. Ultimately, MHM received notice on March 13, 2024 that the debarment was effective immediately and would remain in place until December 13, 2028.

162. Pursuant to the debarment, MHM is prohibited from participating in any federal benefit programs that HUD oversees.

163. On February 13, 2025, Willton notified MHM and related entities that it was exercising its right to terminate the Property Management Agreements and that the termination would become effective as of April 15, 2025.

164. Willton also requested that MHM cooperate with Willton and the replacement property manager, and provide transition documents such as books and records, keys, access codes, correspondence.

165. Willton engaged a replacement manager to take over the operations and management of the Properties and, as required, applied to HUD for approval of that entity as the replacement manager.

166. On April 2, 2025, Willton received HUD approval for the replacement manager to assume management duties of one of the Properties (the Property referred to as Rolling Hills).

167. On June 17, 2025, Willton received a letter from HUD regarding the other nine Properties stating, in part, as follows: "HUD hereby contingently approves Continental Management LLC as management agent for the above subject properties, pending the outcome of relevant litigation involving Wilton [sic] NC NY, LLC, Continental Management LLC, Millennia Housing Management, and MH I Investment, LLC."[13]

168. During the period leading up to HUD's decisions, Willton attempted repeatedly to work with MHM to schedule inspections and walk-throughs at the Properties, but MHM repeatedly refused.

169. As a result of HUD's debarment of MHM and Willton's removals of MH I and the GP Affiliates, and its termination of MHM, MH I, the GP Affiliates, and MHM, no longer have any legal authority to operate at or manage the Properties.

[13] A true and correct copy of that letter is attached as **Exhibit 11** and incorporated by reference in this Second Amended Complaint.

170. Nonetheless, MH I, the GP Affiliates, and MHM have refused to vacate the Properties or turn over operations and management.

171. MH I, the GP Affiliates, and MHM have willfully encroached on Willton's rights to control its Properties without legal right.

172. After receiving notice of their unlawful conduct, MH I, the GP Affiliates, and MHM persist in its unlawful control of Willton's property interests.

173. MH I, the GP Affiliates, and MHM have no lawful right to remain on the premises, including because Willton holds all the rights of ownership and control over the Properties.

174. Nonetheless, MH I, the GP Affiliates, and MHM continue to remain on the Properties and to prevent the replacement manager to enter and take over operations and management of the Properties, which has directly and proximately caused harm to Willton, including as set forth above.

175. Willton is entitled to have MH I, the GP Affiliates, and MHM ejected from the Properties.

**COUNT 12**
**Trespass against MH I, the GP Affiliates, and MHM**

176. Willton incorporates by reference as though fully rewritten herein all allegations contained in Paragraphs 1-175 of this Second Amended Complaint.

177. MH I, the GP Affiliates, and MHM have willfully encroached on Willton's rights to control its Properties without legal right, including as set forth in Paragraphs 154-170, above. Such actions constitute trespass.

178. After receiving notice of their unlawful conduct, MH I, the GP Affiliates, and MHM persist in their unlawful control of Willton's interests in the Properties, including as set forth in Paragraphs 154-170, above.

179. MH I, the GP Affiliates, and MHM have no lawful right to remain on the Properties, including because Willton holds all the rights of ownership and control over the Properties.

180. Nonetheless, MH I, the GP Affiliates, and MHM continue to remain on the Properties and to prevent and interfere with Willton's replacement manger from entering and taking over operations and management of the Properties, which has directly and proximately caused harm to Willton, including as set forth above.

181. MH I, the GP Affiliates, and MHM's actions constitute an unlawful intrusion on Willton's Properties and are a knowing, willful, wanton, reckless, and intentional invasion of Willton's property rights.

182. Willton is entitled to damages in excess of $75,000, with the exact amount to be established at trial, as a direct and proximate result of MH I, the GP Affiliates, and MHM's conduct.

**<u>COUNT 13</u>**
**Conversion against MH I, the GP Affiliates, and MHM**

183. Willton incorporates by reference as though fully rewritten herein all allegations contained in Paragraphs 1-182 of this Second Amended Complaint.

184. MH I, the GP Affiliates, and MHM have intentionally converted revenue and assets from the Properties without right and in violation of Willton's rights.

185. The assets include fixtures, documents, and data relating to the Properties.

186. As a direct and proximate result of MH I, the GP Affiliates, and MHM's conversion, Willton has sustained damages.

187. Willton is entitled to damages in excess of $75,000, with the exact amount to be established at trial, as a direct and proximate result of MH I, the GP Affiliates, and MHM's conduct.

**COUNT 14**
**Injunctive Relief against MH I, the GP Affiliates, and MHM** [14]

188. Willton incorporates by reference as though fully rewritten herein all allegations contained in Paragraphs 1-187 of this Second Amended Complaint.

189. Willton seeks a permanent injunction ordering the following:

a. Permitting Willton immediate access to the Properties;

b. Prohibiting MH I, the GP Affiliates, and MHM and their agents from deleting, altering, destroying, concealing, or otherwise tampering with any fixtures, documents, or data relating to the property or its management of the Properties;

c. Prohibiting MH I, the GP Affiliates, and MHM and their agents from removing, concealing, selling, transferring, or damaging: office equipment, keys, security access, and passwords, domain names, websites, and software logins for all systems utilized at the Properties;

d. Prohibiting MH I, the GP Affiliates, and MHM and their agents from interfering with or denying Willton access to: the Properties, on-site records and equipment, staff members, or contractors;

e. Prohibiting MH I, the GP Affiliates, and MHM and their agents from contacting residents, vendors, federal or state regulators, or other authorities in a way that interferes with the management transition, misrepresents its authority, or causes confusion;

f. Prohibiting MH I, the GP Affiliates, and MHM and their agents from interfering with or retaliating against staff and employees regarding cooperation with Willton;

g. Compelling MH I, the GP Affiliates, and MHM and their agents to immediately deliver to Willton all rent rolls, leases, RealPage OneSite electronic data, architectural plans, documentation from HUD, and any other documents requested by Willton;

h. Compelling MH I, the GP Affiliates, and MHM and their agents to not terminate any existing vendor contracts, and essential utilities until officially transferred to the HUD-approved replacement manager;

---

[14] Willton previously sought this relief as against MHM as part of a motion for temporary restraining order and preliminary injunction in the West Virginia Lawsuit. The court in West Virginia denied Willton's request for temporary restraining order and preliminary injunction; however, it did not reach the question of permanent injunction before that case was dismissed.

i. Compelling MH I, the GP Affiliates, and MHM and their agents to terminate MHM-related existing insurance policies for the Properties;

j. Compelling MH I, the GP Affiliates, and MHM and their agents to preserve all emails, text messages, internal communications, and audit trails that may be relevant to the Properties;

k. Compelling MH I, the GP Affiliates, and MHM and their agents to fully cooperate with Willton and any agent it may designate as relevant to the Properties; and

l. Compelling MH I, the GP Affiliates, and MHM and their agents to relinquish control and access to all project-related bank accounts (including delivery of all account credentials, checkbooks, and records) and cease any further transactions on behalf of the Properties.

**COUNT 15**
**Fraud against all Defendants**

190. Willton incorporates by reference as though fully rewritten herein all allegations contained in Paragraphs 1-189 of this Second Amended Complaint.

191. When Defendants were seeking to induce Willton to make its investment, one of the primary elements of the pitch was that Defendants had a business plan involving efforts to obtain federal Low Income Housing Tax Credits for various properties Defendants owned and/or operated throughout the country.

192. Thus, when the parties executed the Amended Operating Agreement in January 2023, Defendants expressly represented to Willton that there were no actual or threatened proceedings that would threaten or jeopardize their ability to achieve the goals and business plan of the Amended Operating Agreement and Partnership Agreements. Defendants made the business plan an exhibit to the Amended Operating Agreement, along with a schedule of milestones and timing for benchmarks.

193. Unbeknownst to Willton until March 2024, however, Mr. Sinito had been investigated by HUD since as early as 2022, ultimately resulting in Mr. Sinito personally and MHM being debarred from participating in any federal housing program for a period of five years.

194. Upon information and belief, HUD accused Mr. Sinito and MHM of financial mismanagement of tenants' security deposits as well as taxpayer funds providing housing assistance, along with not maintaining property conditions.

195. This debarment sanction is effectively a death penalty for entities like MHM that participate in government contracts, because it prohibits any MHM-affiliated entity, and Mr. Sinito personally, from entering into new business with any federal government agencies, including HUD, or obtaining Low Income Housing Tax Credits for five years. Indeed, Mr. Sinito and Ms. Sinito have now admitted to Willton that Mr. Sinito already has sold or intends to sell his low-income housing projects.

196. Willton anticipates that discovery will demonstrate that Defendants had been aware of the investigation since as early as 2022, yet never disclosed it to Willton. Instead, they intentionally induced Willton to invest in FM15 premised on a business plan to obtain federal Low Income Housing Tax Credits.

197. By way of example, prior to the parties' execution of the Amended Operating Agreement, Defendants provided their own 2020-2021 HUD Audit Reports to Willton to induce it to invest, and Defendants represented that the 2022 HUD Audit Reports were not ready yet and both the tenant security deposit balances and General Partner's distributions were in compliance with HUD regulatory requirements as of December 31, 2022. More than eighteen months later, on July 24, 2024 and only after repeated request from Willton, Defendants finally provided the 2022 HUD Audit Reports, despite having previously submitted them to HUD without informing

Willton. The submitted, but previously withheld, reports were each prepared by an independent auditor and certified by both the General Partners and MHM. These reports revealed a pattern of ongoing financial mismanagement and violations of HUD obligations and regulatory requirements that occurred prior to the execution of the Amended Operating Agreement. Specifically, the reports identified, among other issues: “The Partnership used operating funds for purposes unrelated to the Project” and “[t]he Partnership was not in full compliance with its Regulatory Agreement regarding unauthorized distributions,” all of which Individual Defendants, specifically including Mr. Wells, previously concealed and misrepresented, resulting in the improper depletion of the Properties’ assets.

198. Defendants further falsely represented to Willton in the Amended Operating Agreement that they were not aware of any actual or threatened proceedings against them that would likely have a material adverse effect (financial or otherwise) on FM15, FM15 Properties or any Property Owners, or would threaten or jeopardize their ability to fulfill their management responsibilities or achieve the Amended Operating Agreement’s goals and business plan.

199. Similarly, they also falsely represented to Willton in the Amended Operating Agreement that there were no existing facts which would likely be expected to have a material adverse effect (financial or otherwise) on any of the Properties or any Property Owner.

200. Upon information and belief, Defendants made these fraudulent representations to Willton despite knowing they were in danger of being (and eventually actually becoming) prohibited from engaging in federal low income housing projects or obtaining Low Income Housing Tax Credits.

201. Moreover, as detailed in the “Notice of Suspension and Proposed Debarment of Frank T. Sinito” (“Debarment Notice”), Defendants’ fraudulent actions have already had direct

and materially adverse impacts on certain of the FM15 Properties, debarring MHM and Mr. Sinito from participating in HUD projects or obtaining Low Income Housing Tax Credits.[15]

202. Further, the Debarment Notice details that as of April 30, 2023, Mr. Sinito had underfunded two FM15 Properties' security deposit accounts (the property referred to as Elmcrest Village was underfunded in the amount of $40,174.09 and the property referred to as Riverview Terrace was underfunded in the amount of $12,444.12).

203. Similarly, the Debarment Notice evidences Mr. Sinito having made unauthorized loan distributions between January 1, 2022 and April 30, 2023 for the same two FM15 Properties (Elmcrest Village in the amount of $857,787 and Riverview Terrace in the amount of $280,000).

204. Defendants never disclosed any of the details from the Debarment Notice to Willton or even that MHM and Mr. Sinito were under investigation.

205. At the time the parties were negotiating Willton's investment in FM15, Defendants had a duty to disclose all material facts relevant the potential investment and to ensure that all material representations they made to induce Willton's investment were true.

206. Prior to Willton's investment, Defendants made a series of representations to Willton in Sections 2.08 and 2.09 of the Amended Operating Agreement. Those representations included that MH I, Mr. Sinito, and their affiliated entities were eligible to participate in federal housing programs, that Defendants were unaware of any proceedings that might threaten or jeopardize their ability to continue doing so, and that there were no existing facts which would likely be expected to have a material adverse effect (financial or otherwise) on any of the Properties or any Property Owner.

[15] A true and correct copy of the Debarment Notice is attached as **Exhibit 12** and incorporated by reference in this Second Amended Complaint.

207. Those representations were false, however, and upon information and belief, Willton anticipates that discovery will demonstrate that Defendants knew these representations were false, because they knew HUD was investigating and that they were in jeopardy of being debarred from participating in HUD projects or seeking federal Low Income Housing Tax Credits.

208. In the alternative to the preceding paragraph, if MH I and Mr. Sinito somehow did not know the HUD investigation was ongoing, the misrepresentation was still made with utter disregard and recklessness for the truth, because they knew they had been and were still engaged in a widespread series of potentially criminal actions in their mismanagement of their federal low-income housing projects throughout the country. For example, these actions included:

a. HUD's accusation of MHM's "financial mismanagement of tenant security deposit accounts and taxpayer funds that provide housing assistance, along with not maintaining property conditions."

b. According to the Debarment Notice, "[t]he tenant security deposit accounts for fourteen (14) HUD-insured or HUD-subsidized properties were materially underfunded as of April 30, 2023" and "sixteen (16) properties had unauthorized distributions or loans from January 1, 2022, to April 30, 2023. There was a total of 147 improper distributions/loans in the amount of $4,578,671."

c. According to the Debarment Notice two FM15 Properties managed by MH I and Mr. Sinito and Mrs. Sinito had underfunded tenant security deposit accounts (Elmcrest Village underfunded in the amount of $40,174.09 and Riverview Terrace underfunded in the amount of $12,444.12).

d. According to the Debarment Notice, there were unauthorized distributions of loans between January 1, 2022 and April 30, 2023 for two FM15 Properties (Elmcrest Village in the amount of $857,787 and Riverview Terrace in the amount of $280,000).

e. Audits of Mr. Sinito's management found a plethora of misappropriations of security deposits and operating funds for purposes unrelated to the relevant projects as well as failures to comply with Regulatory Agreements regarding unauthorized distributions.

209. The Debarment Notice demonstrates that HUD found these events occurred between January 1, 2022 and April 30, 2023, making it appear certain that Defendants were aware

of the potential jeopardy they had created prior to closing on the Amended Operating Agreement with Willton.

210. Defendants' misrepresentations were material to Willton's investment, because Willton would not have invested in the project if Defendants had not made these representations to it, including but not limited to the representation by Defendants to Willton that they and their affiliated entities were able to participate in federal housing programs and seek federal Low Income Housing Tax Credits.

211. Mr. Wells and Ms. Sinito furthered the fraud by providing false, misleading, and non-responsive financial information and feedback regarding Willton's investment during the course of the investment, and instructing their employees to communicate false and misleading information to Willton as well.

212. For example, in an apparent effort to deflect from the delay in 2023 distributions to Willton and Defendants' misappropriation of funds, Ms. Sinito informed Willton in October 2023 that Defendants were undergoing initial qualified allocation plan reviews and engaging in preliminary discussions with housing finance agencies to apply for Low Income Housing Tax Credit. In reality, however, Defendants' ongoing violations rendered them ineligible to apply for any Low Income Housing Tax Credits.

213. Ms. Sinito and Mr. Wells attempted to conceal Defendants' misappropriations and deflect Willton's concerns regarding financial transparency. Since February 2023, Ms. Sinito has repeatedly refused to provide Willton with full access to all FM15-related bank accounts and financial records. Beginning November 2023, only a limited subset of bank accounts was disclosed. In October 2023, in response to Willton's inquiries regarding financial transparency and the delayed 2023 distributions, Mr. Wells asserted that "the first half results yielded returns 59%

greater than anticipated," further claiming that "[t]o the question at hand, you will get your distributions in early November…the distributions are coming from Frank [Sinito] as the properties do not have the cash due to the insurance and other payments."

214. Subsequently in November 2023, Ms. Sinito sent check images showing $328,278 in distributions, but the checks were drawn from accounts previously unknown to Willton. This prompted Willton to make repeated requests for complete bank account details and statements from Ms. Sinito. When partial bank statements were finally provided in April 2024, they revealed insufficient funds at the time of distribution due to Defendants' misappropriations and confirmed that the funds were from non-FM15 accounts to conceal earlier misappropriations by the Defendants. To-date, not all relevant bank accounts and corresponding statements have been made available to Willton.

215. On January 21, 2024, Ms. Sinito notified Willton that "we will plan on making the balance of your 2023 distribution once the HUD audits are completed." Contrary to that representation, the balance of the 2023 distribution was never made even after the completion of the HUD audit, and no distributions for 2024 have been made to date either.

216. Upon review, the 2023 HUD Audit Report identified ongoing and material misappropriations of funds by the Defendants. By way of example, the 2023 HUD Audit Reports prepared by an independent auditor and certified by both the General Partners and MHM specially identified, among other issues: "During 2023, project operating funds were withdrawn from the Partnership and used for purposes unrelated to the Project" and "[t]he Partnership was not in full compliance with its Regulatory Agreement regarding unauthorized distributions." Individual Defendants, specifically including Ms. Sinito, previously tried to conceal those facts from Willton.

217. To obstruct the independent audit process to complete the 2024 HUD Audit Reports and to conceal Defendants' misappropriations and violations during 2024, Ms. Sinito directed MHM's legal counsel to contact the independent auditors directly. The draft 2024 HUD Audit Reports prepared by the independent auditor revealed ongoing and material misappropriations of funds by Defendants during 2024. After the auditors rejected that attempt, Ms. Sinito has continued to withhold critical information required to finalize the 2024 HUD audit, placing the Properties at risk of regulatory penalties and financial damages due to noncompliance with HUD deadlines.

218. Ms. Sinito further cancelled of all monthly meetings between MH I and Willton and denied Willton's requests for site visits.

219. Defendants intended to mislead Willton and induce Willton's reliance on their misrepresentations, including so they could obtain Willton's investment and use it to their own unrelated benefit via unauthorized self-beneficial distributions.

220. Willton in fact relied on those misrepresentations, and was justified in doing so.

221. Defendants' fraud is a direct and proximate cause of damages suffered by Willton in excess of Seventy-Five Thousand Dollars ($75,000.00), with the exact amount to be proven at trial.

222. Further, Willton is entitled to an award of punitive damages and attorneys' fees due to Defendants' fraud, as their fraud was intentional and the result of malice.

## COUNT 16
## Fraudulent Transfer against all Defendants

223. Willton incorporates by reference as though fully rewritten herein all allegations contained in Paragraphs 1-222 of this Second Amended Complaint.

224. Defendants made a series of transfers to Mr. Sinito out of the funds of FM15 with an actual intent to hinder, delay, or defraud Willton, a present and/or future creditor.

225. Defendants also made a series of transfers out of FM15's funds to entities owned or controlled by one or more of the Sinitos, including the following: Brookwood NC LLC, Cassady Village OH LLC, Country Park TX LLC, Hartford Avenue Apartments LLC, Highpoint Duke N TX, Highpoint Duke S TX, Lakeside Garden, Memphis Towers TN TC LP, Morningside 2192 TN LLC, Park Place OH LLC, Peace Lake LA TC LP, South Park MS LLC, and Wilshire Woods Apartments LLC.

226. Each of the Individual Defendants, separately and collectively, perpetrated and facilitated the fraudulent transfers by providing false, misleading, or non-responsive financial information to Willton to obscure the transfers.

227. The transfers to Mr. Sinito in particular reflect numerous "badges of fraud" including, but not limited to the fact that:

a. The transfers were made to Mr. Sinito, who as MH I's managing member was an insider to the company;

b. Under the Amended Operating Agreement, MH I and Individual Defendants were not permitted to unilaterally make these transfers to Mr. Sinito without Willton's consent; and

c. Defendants failed to disclose the transfers or obtain Willton's consent despite having numerous opportunities to disclose and explain the transfers to Willton.

228. Moreover, Defendants made the transfers without receiving reasonably equivalent value from Mr. Sinito, or any other party, in exchange for the transfers.

229. Given the facts and circumstances surrounding the transfers, the transfers are fraudulent pursuant to Ohio Revised Code §§ 1336.04 and 1336.05.[16]

230. In making and accepting the transfers, Defendants acted with a conscious disregard for Willton's rights, with a great probability of causing Willton substantial harm.

---

[16] The Amended Operating Agreement is governed by Ohio law. (*See* Amended Operating Agreement § 12.02.)

231. In April 2023, MH I and Individual Defendants also attempted to transfer membership in two additional FM15 assets (the properties known as Kona Villa and Oxford Row I), but were prohibited from doing so by a state governmental agency, as a result of a record of previous unauthorized transfers.

232. Additionally, Willton has recently discovered at least one previously fraudulently concealed bank account that Defendants have utilized to misappropriate funds relating to FM15, and Willton reasonably anticipates that discovery will disclose additional bank accounts relating to FM15 that Defendants have fraudulently concealed.

233. Defendants' fraudulent transfers are a direct and proximate cause of damages suffered by Willton in excess of Seventy-Five Thousand Dollars ($75,000.00), with the exact amount to be proven at trial.

234. Further, Willton is entitled to an award of punitive damages and attorneys' fees as a result of Defendants' fraudulent transfers, as those fraudulent transfers were intentional and the result of malice.

**COUNT 17**
**Civil RICO Violations (18 U.S.C. § 1962(a)-(d)) against Individual Defendants**

235. Willton incorporates by reference as though fully rewritten herein all allegations contained in Paragraphs 1-234 of this Second Amended Complaint.

236. Defendants and each member of the Sinito Enterprise is a "person" as defined by 18 U.S.C. § 1961(3).

237. The Sinito Enterprise constitutes an "enterprise" as defined by 18 U.S.C. § 1961(4) because the members of the Sinito Enterprise have associated together for the common purpose of intentionally and willfully defrauding Willton and, on information and belief, other victims.

238. Individual Defendants have conspired to and have actually conducted a criminal enterprise via the Sinito Enterprise that has engaged in a pattern and practice of racketeering activity in violation of 18 U.S.C. § 1962 that has injured Willton's business and property.

239. Individual Defendants personally conduct the affairs of the Sinito Enterprise by leading, running, managing, and directing the affairs of the Sinito Enterprise via The Millennia Companies.

240. Upon information and belief, Mr. Sinito has personally controlled, directed, and received financial benefit from each of the companies that comprise The Millennia Companies as described in detail above.

241. Ms. Sinito was recently appointed as Chief Investment Office of MHM. She has been described as "a stalwart leader at Millennia." She is expected to "oversee the strategic sale of the affordable housing portfolio," and is now a member of "Millennia's newly formed Executive Committee."

242. In conducting the affairs of the Sinito Enterprise, Individual Defendants have engaged in a pattern and practice of racketeering activity, including but not limited to by defrauding their business partner investors (both Willton and others as alleged herein) and embezzling funds via wire fraud that they have invested in one or more of The Millennia Companies. Individual Defendants have committed these acts of fraud and embezzlement via wire fraud far more than two times within the past ten years.

243. As detailed in this Count and throughout this Second Amended Complaint, Individual Defendants' pattern and practice of racketeering activity includes having caused MH I and the GP Affiliates to embezzle more than $1.8 million via wire fraud by making hundreds of unauthorized disbursements from Property Owners' and/or FM15's funds since January 2023.

Many of these unauthorized disbursements have been to Mr. Sinito himself or to other members of the Sinito Enterprise in which he has a financial interest unrelated to FM15. Each of these hundreds of acts of embezzlement via such unauthorized distributions detailed below constitutes wire fraud in violation of 18 U.S.C. § 1343 and a separate act of racketeering activity as defined by 18 U.S.C. § 1961(1), and they demonstrate a pattern and practice of racketeering activity against Willton specifically.

244. In violation of 18 U.S.C. § 1962(a)-(d), Individual Defendants – including through hundreds of separate acts of wire fraud in violation of 18 U.S.C. § 1343 that constitute a pattern of racketeering – have derived income and acquired or maintained an interest in the Sinito Enterprise, which engages in interstate commerce. To date, Willton has discovered at least 118 unauthorized disbursements of funds from FM15's operating account in the aggregate amount of over $1.8 million to either an entity associated with Mr. Sinito's personal bank account, an unrelated entity from a project unrelated to FM15, or to Mr. Sinito directly. Of these 118 unauthorized payments, 85 went directly to Mr. Sinito personally totaling over $1.5 million, and at least 13 other Sinito entities that appear to be members of the Sinito Enterprise also received unauthorized transfers.

245. Specifically, Individual Defendants, either directly or through the Sinito Enterprise, have transmitted or caused to be transmitted by means of wire communications in interstate commerce, certain writings, signs, signals, pictures, and/or sounds for the purpose of executing a scheme or artifice to defraud Willton by embezzling funds. These incidents of wire fraud included, but were not limited to, the following (all from Property Owners to Mr. Sinito or other Sinito-controlled entities):

a. On March 9, 2023, $50,000 was wired to Mr. Sinito from the Cedar and Warrensville Apartments Limited Partnership;

b. On April 11, 2023, $15,000 was wired to Mr. Sinito from the Parkersburg Powell Limited Partnership;

c. On May 22, 2023, $10,000 was wired from the Heritage Youngstown Limited Partnership to Hartford Avenue Apartments LLC;

d. On May 15, 2023, $20,000 was wire from the Liberty Plaza II, Ltd entity to an unrelated property referred to as Peace Lake LA TC LP;

e. On May 18, 2023, $10,000 was wired to Mr. Sinito from the Cadillac Harbor View LDHA LTD;

f. On May 22, 2023, $10,000 was wired from the Heritage Youngstown Limited Partnership to an unrelated property, Hartford Avenue Apartments LLC;

g. On June 6, 2023, $15,000 was wired from the Cedar and Warrensville Apartments Limited Partnership to Mr. Sinito;

h. On June 6, 2023, $20,000 was wired to Mr. Sinito from the Heritage Youngstown Limited Partnership;

i. On June 6, 2023, $15,000 was wired to Mr. Sinito from Liberty Plaza II, Ltd;

j. On June 6, 2023, $30,000 was wired to Mr. Sinito from the Flushing Elmcrest Limited Dividend Housing Association Limited Partnership;

k. On June 29, 2023, $40,400 was withdrawn from the Marquette Snowberry Limited Dividend Housing Association Limited Partnership Account at Independence Bank and deposited in Mr. Sinito's personal account via online transfer;

l. On July 10, 2023, $15,000 was wired from the Petoskey Riverview Limited Dividend Housing Association Limited Partnership account to Mr. Sinito;

m. On September 12, 2023, $20,000 was wired from the Cedar and Warrensville Apartments Limited Partnership to an unrelated property, Cassidy Village, Ohio LLC;

n. On September 13, 2023, $15,000 was wired from the Cedar and Warrensville Apartments Limited Partnership to an unrelated property, Memphis Towers TN TC LP;

o. On September 13, 2023, $35,000 was wired from the Cedar and Warrensville Apartments Limited Partnership to an unrelated entity, Memphis Towers TN TC LP;

p. On October 6, 2023, $20,000 was wired from Heritage Youngstown Limited Partnership to an unrelated property, Brookwood NC LLC;

q. On October 10, 2023, $12,000 was wired from Heritage Youngstown Limited Partnership to an unrelated property, Memphis Towers TN TC LP;

r. On January 9, 2024, $25,000 was wired from Parkersburg Powell Limited Partnership to an unrelated property, Brookwood NC LLC;

s. On February 5, 2024, $9,000 was wired from Parkersburg Powell Limited Partnership to an unrelated property, Wilshire Woods Apartments LLC;

t. On February 13, 2024, $7,000 was wired from Parkersburg Powell Limited Partnership to an unrelated property, Morningside 2192 TN LLC; and

u. Between December 10, 2024 and December 11, 2024, a total of $96,075.53 was wired to one of the law firms representing Defendants in this lawsuit, Baker & Hostetler LLP, from

    i. Cedar and Warrensville Apartments Limited Partnership,

    ii. Flushing Elmcrest Limited Dividend Housing Association Limited Partnership,

    iii. Heritage Youngstown Limited Partnership,

    iv. Liberty Plaza II Ltd.,

    v. Petoskey Riverview Limited Dividend Housing Association Limited Partnership,

    vi. Winchester Limited Dividend Housing Association Limited Partnership, and

    vii. Marquette Snowberry Limited Dividend Housing Association Limited Partnership.

246. Each of the above transactions constitutes "racketeering activity" relating to wire fraud as defined by 18 U.S.C. § 1961(1), in violation of 18 U.S.C. § 1962(a)-(d) and 18 U.S.C. § 1343.

247. Upon information and belief, the actions alleged above are also a part of Individual Defendants' pattern and practice of racketeering activity whereby they commit intentional acts to defraud business partner investors like Willton to invest in one or more of The Millennia Companies' operation of low-income housing projects and obtaining federal Low Income Housing Tax Credits. Upon information and belief, once Individual Defendants have fraudulently induced

such investments, they then routinely engage in acts of embezzlement via wire fraud to the injury of those investors.

248. Individual Defendants have engaged in a pattern of conduct involving deception and inducement of investors to commit capital, followed by the misappropriation, embezzlement, and conversion of funds belonging to the owners and/or the joint venture entity. This conduct was not limited to Willton, but rather appears to have been systematically directed at numerous investors. Individual Defendants have engaged in a pattern of conduct involving deception and inducement of investors to commit capital, followed by the misappropriation, embezzlement, and conversion of funds belonging to the owners and/or the joint venture entity. This conduct was not limited to Willton, but rather appears to have been systematically directed at numerous investors, and is further evidenced by other lawsuits filed against the Sinitos and entities comprising the Sinito Enterprise credibly asserting similar allegations. (*See Paul Zaretsky v. Millennia Housing Capital, LLC, et al.*, Cuyahoga County (Ohio) Common Please, Case No. CV 24 100446.)

249. Upon information and belief, the Sinito Enterprise's pattern and practice of racketeering activity as alleged above also includes his use of The Millennia Companies to violate HUD obligations and requirements as part of the Sinito Enterprise's operation of low-income housing projects and attempts to obtain federal Low Income Housing Tax Credits, all as a part of a scheme to defraud and then embezzle from investors like Willton via wire fraud.

250. HUD has accused Mr. Sinito and MHM of engaging in financial mismanagement of tenants' security deposits as well as taxpayer funds providing housing assistance, along with not maintaining property conditions. Similarly, HUD has accused Mr. Sinito and MHM of misappropriating millions of dollars from HUD-insured or HUD-subsidized properties throughout the country. Based on these activities, HUD debarred Mr. Sinito and MHM from participating in

any new HUD business for five years, which is the most severe sanction HUD can impose on a property owner.

251. Upon information and belief, Willton also expects it will uncover other racketeering activities by Individual Defendants and the Sinito Enterprise during discovery.

252. Individual Defendants' repeated acts of wire fraud constitute "a pattern of racketeering activity" pursuant to 18 U.S.C. § 1961(5). Individual Defendants have committed these patterns and practices of racketeering activity knowingly and intentionally, with the intent to damage Willton's business and property interests.

253. Individual Defendants' pattern and practice of racketeering activities alleged above, including hundreds of acts of wire fraud, are related, they occurred in and they affected interstate commerce within the meaning of 18 U.S.C. § 1962(c), and they pose a threat of continued criminal activity, both to Willton and to Mr. Sinito's other business partners specifically, and to the public generally.

254. Individual Defendants' acts of wire fraud alleged above have continued for years and will continue into the future if they are not stopped.

255. Willton has standing to bring this claim because there is a direct relationship between its injuries and the conduct involving a pattern and practice of racketeering activities, as described above. Specifically, at a minimum and as described above, Individual Defendants have committed hundreds of acts of wire fraud in violation of 18 U.S.C. § 1962(a)-(d) and 18 U.S.C. § 1343 and embezzled more than $1.8 million by making these unauthorized disbursements from Property Owners' and/or FM15's funds since January 2023, all to the injury of Willton.

256. As a direct and proximate result of Individual Defendants' and the Sinito Enterprise's actions and pattern and practice of racketeering activities, including wire fraud,

Willton has suffered an injury to its business and property, in excess of Seventy-Five Thousand Dollars ($75,000.00), with the exact amount to be proven at trial.

257. Pursuant to 18 U.S.C. § 1964, Willton is entitled to its damages from those violations, specifically including but not limited to treble damages and costs of this lawsuit, including reasonable attorneys' fees.

**COUNT 18**

**Breach of Fiduciary Duty against MH I, Mr. Sinito, Ms. Sinito, and Mr. Wells**

258. Willton incorporates by reference as though fully rewritten herein all allegations contained in Paragraphs 1-257 of this Second Amended Complaint.

259. While MH I was the Operating Member of FM15, MH I (including through Mr. Sinito, Ms. Sinito, and Mr. Wells) owed a fiduciary duty to the members of FM15, including Willton as the majority owner.

260. MH I had a duty to perform as Operating Member of FM15 in good faith, to refrain from self-dealing, to follow the provisions of the Amended Operating Agreement, and to act in the best interests of FM15 and its members.

261. As explained in substantial detail throughout this Second Amended Complaint, since the execution of the Amended Operating Agreement, MH I (including through Mr. Sinito, Ms. Sinito, and Mr. Wells) consistently acted in bad faith, including but not limited to at least the following:

a. Failing to provide Willton with the required books, records, opportunity to inspect the Properties, and financial information including tax returns;

b. Misappropriating funds;

c. Engaging in self-dealing;

d. Making unauthorized transfers of money to Mr. Sinito and entities owned by or affiliated with Mr. Sinito;

e. Failing to satisfy the document requirements made by the independent certified public accountant engaged by FM15 to complete the 2024 annual HUD audit;

f. Failing to satisfy the document requests and requirements made by the independent certified public accountant engaged by FM15 to amend the 2023 tax returns and complete the 2023 tax returns; and

g. Violating multiple other provisions of the Amended Operating Agreement as detailed above.

262. Willton anticipates it will uncover other instances of bad faith and breaches of fiduciary duty once it is able to conduct discovery and/or fully review the books and records of FM15.

263. MH I's breaches of its fiduciary duties (including through Mr. Sinito, Ms. Sinito, and Mr. Wells) are a direct and proximate cause of damages suffered by Willton in excess of Seventy-Five Thousand Dollars ($75,000.00), with the exact amount to be proven at trial.

264. Further, Willton is entitled to an award of punitive damages and attorneys' fees due to MH I's numerous breaches of its fiduciary duties and intentional conduct, as those breaches were intentional and the result of malice.

**COUNT 19**
**Unjust Enrichment against MHM**

265. Willton incorporates by reference as though fully rewritten herein all allegations contained in Paragraphs 1-264 of this Second Amended Complaint.

266. Since MHM's termination as property manager, MHM has continued to pay itself from one or more of the Properties' bank accounts.

267. Additionally, MHM has failed to complete annual audits for the Properties, as required by HUD because the Properties are Section 8 housing facilities.

268. As of the date of this filing, MHM has not submitted the required documents for the audits.

269. MHM has missed the 90-day regulatory deadline to complete the audits following the last fiscal year, and the subsequent deadline after the grace period to comply.

270. This failure to comply exposes the Properties to potential enforcement action by HUD, which could lead to penalties.

271. Any threatened penalties jeopardize Willton's relationship with HUD as the controlling owner of the Properties, and would necessarily impact the tenants' housing and well-being as recipients of a federal benefit.

272. MHM has been unjustly enriched by its willful, wanton, and reckless conduct in unlawfully maintaining control over the Properties and receiving revenue that should rightly go to Plaintiffs.

273. As a direct and proximate result of MHM's unjust enrichment, Willton has sustained damages.

274. It would be inequitable to allow MHM to be unjustly enriched and retain the benefit of its unlawful actions without compensating Willton for its loss.

275. Willton is entitled to damages in excess of $75,000, with the exact amount to be established at trial, as a direct and proximate result of MHM's conduct.

**COUNT 20**
**Unjust Enrichment against Individual Defendants**

276. Willton incorporates by reference as though fully rewritten herein all allegations contained in Paragraphs 1-275 of this Second Amended Complaint.

277. Individual Defendants made or caused to be made a series of transactions transferring assets from Property Owners and/or FM15 to themselves and/or entities they control or controlled.

278. Willton, as an owner of an 84.86% interest in FM15, is the rightful owner of all or part of the assets that Individual Defendants transferred from FM15 to themselves and/or entities they control or controlled.

279. Individual Defendants retained the benefit of the unauthorized transfers to themselves and/or entities they control or controlled, thereby enriching themselves.

280. By receiving and retaining the unauthorized transfers to themselves and/or entities they control or controlled without providing adequate compensation in return, Individual Defendants have been unjustly enriched to Willton's detriment.

281. As a direct and proximate result of Individual Defendants' unjust enrichment, Willton has been damaged and will continue to be damaged in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), with the exact amount to be proven at trial.

**COUNT 21**
**Promissory Estoppel against Mr. Sinito and Mrs. Sinito**

282. Willton incorporates by reference as though fully rewritten herein all allegations contained in Paragraphs 1-281 of this Second Amended Complaint.

283. As stated in the Guaranty, "Investor Member [was] unwilling to enter into the Operating Agreement unless Guarantor provides the guaranties under this Agreement."

284. The Guaranty was executed by Mr. Sinito and Mrs. Sinito.

285. Within the Guaranty, Mr. Sinito and Mrs. Sinito personally guaranteed the Contractual ROI Payments, which was a clear and unambiguous promise.

286. Willton reasonably relied on Mr. Sinito's and Mrs. Sinito's agreement to pay the Contractual ROI Payments and to provide balance sheets evidencing that they had not less than $41,110,000 in equity.

287. It was reasonably foreseeable to Mr. Sinito and Mrs. Sinito that Willton was relying on that promise, because the Guaranty stated "Investor Member [was] unwilling to enter into the Operating Agreement unless Guarantor provides the guaranties under this Agreement."

288. Mr. Sinito's and Mrs. Sinito's promises under the Guaranty were false and misleading because they have not honored those obligations.

289. Mr. Sinito's and Mrs. Sinito's promises were made with a conscious disregard for the rights of Willton with the knowledge that substantial harm would result to Willton.

290. Willton did not and could not know that Mr. Sinito and Mrs. Sinito would not honor their obligations under the Guaranty.

291. In reliance on Mr. Sinito's and Mrs. Sinito's promises as reflected in the Guaranty, Willton invested over $19 million dollars in FM15.

292. As a direct and proximate result of Willton's reliance on Mr. Sinito's and Mrs. Sinito's promises in the Guaranty, Willton has been damaged and will continue to be damaged in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), with the exact amount to be proven at trial.

**COUNT 22**
**Action for Accounting against all Defendants**

293. Willton incorporates by reference as though fully rewritten herein all allegations contained in Paragraphs 1-292 of this Second Amended Complaint.

294. Willton is unable to protect or fully and meaningfully assert its rights because Defendants have been and continue to be in total control of the finances of FM15 and the Property Owners despite MH I being removed as Operating Member of FM15, the GP Affiliates being removed as General Partners of Property Owners, and MHM being terminated as the property manager of the Properties.

295. The exact amount of Willton's damages that resulted and/or may have resulted from Defendants' self-dealing and breaches of contract, fraud, breaches of fiduciary duties, conversion, fraudulent transfer, and unjust enrichment cannot be determined without an accounting, because the information necessary to determine that amount is within the exclusive knowledge, possession and control of Defendants who have failed to provide Willton with full and accurate books and records of FM15 and Property Owners as required by the Amended Operating Agreement.

296. Based on the business plan, financial reports, and projections provided by MH I, the Property Owners' bank accounts should have held a combined cash balance (excluding reserves) of at least $7.0 million as of April 30, 2025, reflecting net income generated by the Properties since January 30, 2023. However, as of that date, the actual bank balance was only approximately $1.2 million—indicating a shortfall of approximately $5.8 million, well above the amount attributed to unauthorized distributions identified in the 2023 HUD Audit Reports prepared by an independent auditor. The missing funds appear to have been embezzled, misappropriated, or concealed by Defendants. The precise amount can only be determined once MH I, the GP Affiliates, and their affiliates produce complete and accurate financial records for an independent audit.

297. Willton is owed fiduciary duties by MH I and the GP Affiliates (including through Individual Defendants) and is entitled to an accounting of the books and records of FM15 and Property Owners.

298. Willton is entitled to profits in Defendants' possession.

299. Based on all foregoing, Willton's legal and monetary remedies are inadequate without an accounting.

## PRAYER FOR RELIEF

WHEREFORE, Willton demands judgment against Defendants, jointly and severally, and prays for relief, as follows:

1. For compensatory damages in an amount to be proven at trial, in excess of $75,000, including but not limited to the payment the Contractual ROI Payments, the Put Right, and any penalties or fines imposed by any governmental agency or third party;

2. For rescission of the Amended Operating Agreement, Partnership Agreements, and Property Management Agreements, and a return of Willton's investment in an amount to be proven at trial;

3. For any and all relief afforded pursuant to 18 U.S.C. § 1964, specifically including but not limited to treble damages and costs of this lawsuit, including reasonable attorneys' fees;

4. For an order requiring MH I, the GP Affiliates, the Sinitos and MHM, to disclose to Willton all FM15's and Property Owners' bank accounts including reserve accounts, and relinquish and transfer control of all such accounts to Willton, and to return immediately all funds misappropriated from FM15 and the Property Owners;

5. For an order requiring a full accounting of the books and records of FM15 and the Property Owners;

6. For a declaration that:

   a. MH I is obligated to pay Willton the 8% per year Contractual ROI Payments as of April 15 of each calendar year, plus interest from the date each such Contractual ROI Payment was due;

   b. MH I is obligated pay Willton the amount of the Put Right by purchasing Willton's interest in the properties referred to as Cedar Warrensville and Heritage for $6,327,528.14, plus interest from July 22, 2024; and

   c. MH I is obligated to immediately return or repay all funds disbursed in connection with the unauthorized operating expenses and capital expenditures;

7. For a further declaration that:

   a. MH I is obligated to cause its affiliate to provide directly to Willton a minimum of a fifteen percent (15%) IRR on Willton's investment;

   b. MH I is obligated to compensate FM15 for any losses to FM15 and the Property Owners exceeding $50,000 in Net Cash Flow or balance sheet impact resulting from its breached representations and warranties;

c. MH I is obligated to make and/or cause the GP Affiliates to make all distributions to Members in accordance with the Amended Operating Agreement;

d. MH I is obligated to pay Willton the amount of Purchase Right by purchasing Willton's Membership Interest in FM15 (excluding its interests in the properties referred to Cedar Warrensville and Heritage, which are subject to Willton's Put Right) for $25,050,436.63 (i.e., $31,377,964.77 minus $6,327,528.14), plus interest from October 30, 2024;

e. MH I is obligated to deliver to Willton all accounts, books, and records of FM15 and each Property Owner;

f. MH I is obligated to satisfy Willton's demand to inspect each Property, and books and records on-site and off-site;

g. MH I is obligated to satisfy Willton's and Willton's designated agents' requirements to complete the audit of books of account records;

h. MH I is obligated to immediately provide documents and answer audit inquiries required to complete the 2024 HUD annual audit;

i. MH I is obligated to immediately pay for all Capital Expenditures and Pre-Closing Property Damage and direct and indirect damages to the Property Owners, FM15, and Willton; and

j. Willton has the right, in its sole discretion and without the consent of any person or entity, to sell or otherwise transfer FM15's interest in the Properties or any related entity, and to apply any proceeds toward the satisfaction of any judgment in this case;

8. For a further declaration that:

a. Mr. Sinito and Mrs. Sinito are jointly and severally obligated to make the necessary capital contributions to MH I so that MH I must then contribute the funds to FM15 and tender immediately to Willton the 8% per year Contractual ROI Payments as of April 15 of each calendar year, plus interest from the date each such Contractual ROI Payment was due, as guarantors of MH I's obligations under the Amended Operating Agreement;

b. Mr. Sinito and Mrs. Sinito are jointly and severally obligated to pay Willton $6,327,528.14 with respect to the properties referred to as Cedar and Warrensville and Heritage, plus interest, to satisfy Willton's Put Right; and

c. Mr. Sinito and Mrs. Sinito are obligated to provide to Willton a true and correct copy of their most recent balance sheet evidencing not less than $41,110,000 in equity;

9. For a further declaration that Mr. Sinito and Mrs. Sinito are jointly and severally obligated to pay Willton the IRR Purchase Price to provide Willton with an IRR equal to fifteen percent (15%) on Willton's interest in the Properties (excluding Cedar and Warrensville or Heritage, which are subject to Willton's Put Right)

10. For a further declaration that:

    a. Willton has the sole and exclusive authority to cause FM15 and the Property Owners to amend, modify, supplement, or terminate any Operating Member Affiliate Agreements, including the Partnership Agreements and Property Management Agreements;

    b. MH I has been and is removed as Operating Member of FM15, and is required to relinquish all management rights, powers, and authority over FM15 to Willton;

    c. Each GP Affiliate has been and is removed from its role as manager and General Partner of its Partnership, and is required to relinquish all management rights, powers, and authority over Property Owners to FM15 and Willton;

    d. MHM has been and is terminated from its role as property manager for the Properties;

    e. MH I, each of the GP Affiliates, and MHM are obligated to immediately surrender to Willton all books, records, and accounts in accordance with the Amended Operating Agreement, the Property Owner Partnership Agreements, and the Property Management Agreements;

    f. MH I, each of the GP Affiliates, and MHM are obligated to cooperate with Willton, HUD, state and local authorities, and lenders in effectuating their respective removals and terminations;

    g. MH I, the GP Affiliates, and MHM are obligated to provide documents and answer audit inquiries to complete 2024 HUD annual audit;

    h. MH I, each of the GP Affiliates, and MHM are obligated to permit a third-party certified public accountant retained by Willton to commence on-site audits; and

    i. MH I, the GP Affiliates, and MHM are obligated to return any overpayment of property management fees to Property Owners;

11. For a permanent injunction ordering the following:

    a. Permitting Willton immediate access to the Properties;

    b. Prohibiting MH I, the GP Affiliates, and MHM and their agents from deleting, altering, destroying, concealing, or otherwise tampering with any fixtures, documents, or data relating to the property or its management of the Properties;

c. Prohibiting MH I, the GP Affiliates, and MHM and their agents from removing, concealing, selling, transferring, or damaging: office equipment, keys, security access, and passwords, domain names, websites, and software logins for all systems utilized at the Properties;

d. Prohibiting MH I, the GP Affiliates, and MHM and their agents from interfering with or denying Willton access to: the Properties, on-site records and equipment, staff members, or contractors;

e. Prohibiting MH I, the GP Affiliates, and MHM and their agents from contacting residents, vendors, federal or state regulators, or other authorities in a way that interferes with the management transition, misrepresents its authority, or causes confusion;

f. Prohibiting MH I, the GP Affiliates, and MHM and their agents from interfering with or retaliating against staff and employees regarding cooperation with Willton;

g. Compelling MH I, the GP Affiliates, and MHM and their agents to immediately deliver to Willton all rent rolls, leases, RealPage OneSite electronic data, architectural plans, documentation from HUD, and any other documents requested by Willton;

h. Compelling MH I, the GP Affiliates, and MHM and their agents to not terminate any existing vendor contracts, and essential utilities until officially transferred to the HUD-approved replacement manager;

i. Compelling MH I, the GP Affiliates, and MHM and their agents to terminate MHM-related existing insurance policies for the Properties;

j. Compelling MH I, the GP Affiliates, and MHM and their agents to preserve all emails, text messages, internal communications, and audit trails that may be relevant to the Properties;

k. Compelling MH I, the GP Affiliates, and MHM and their agents to fully cooperate with Willton and any agent it may designate as relevant to the Properties; and

l. Compelling MH I, the GP Affiliates, and MHM and their agents to relinquish control and access to all project-related bank accounts (including delivery of all account credentials, checkbooks, and records) and cease any further transactions on behalf of the Properties;

12. For reasonable attorney fees (pursuant to the Guaranty), costs, and punitive damages;

13. For prejudgment and post-judgment interest;

14. For an order authorizing a judicial and/or post-judgment sale of any property attached pursuant to a valid order of this Court, including both real and personal property, in satisfaction of any judgment awarded in this case; and

15. For such other relief as the Court deems just and proper.

Date: July 28, 2025

Respectfully submitted,

**Willton NC NY, LLC**

By: *<u>/s/ Alexander Talel</u>*
Alexander Talel
One of Its Attorneys

Alexander Talel
ICE MILLER LLP
1500 Broadway, 29th Floor
New York, NY 10036
(212) 824-4975
alex.talel@icemiller.com

Joshua A. Klarfeld (Admitted *Pro Hac Vice*)
ICE MILLER LLP
600 Superior Ave. East, Suite 1300
Cleveland, OH 44114
(216) 394-5063
joshua.klarfeld@icemiller.com

***Counsel for Plaintiff Willton NC NY, LLC***